# In the District Court of the United States
## For The District of South Carolina
### BEAUFORT DIVISION

|  |  |  |
|---|---|---|
| **DEBORAH M. SMITH**, | ) | |
| | ) | Civil Action No. 9:06-1287-JFA-GCK |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF THE MAGISTRATE JUDGE** |
| **MICHAEL J. ASTRUE**,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## I.  INTRODUCTION

This case is before the court for a report and recommendation pursuant to Local Rule 83.VII.02, D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).

The plaintiff, Deborah M. Smith (the "Plaintiff" or "Claimant"), brought this action pursuant to Section 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. § 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security to cease the Plaintiff's receipt of supplemental security income ("SSI") benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f.

---

[1]     Michael J. Astrue became Commissioner of Social Security on February 12, 2007, and is, therefore, substituted for Jo Anne B. Barnhart as the defendant in this case pursuant to Federal Rule of Civil Procedure 25(d)(1).

Page 1 of  31

## II.  BACKGROUND TO THE CLAIM

Plaintiff was born on February 3, 1957, which makes her a "younger person" pursuant to the Regulations.[2]  She has a high school degree and has completed two years of college and received a degree in human services.  (Tr. 492)  Plaintiff has worked in the past as a convenience store cashier/clerk.

In a determination dated October 22, 1997, the Plaintiff was awarded SSI benefits beginning on June 1, 1997, due to obesity and osteoarthritis that met the requirements of Section 9.09A (obesity) of the Listing of Impairments.  (Tr. 29, 86-124)

In 2002, the Plaintiff attended Florence Tech for two (2) semesters to work toward a degree in nursing.  (Tr. 491, 493)

## III.  HISTORY OF ADMINISTRATIVE PROCEEDINGS

### A.  Introduction

Plaintiff received her SSI benefits from June 1, 1997 through August 23, 2002, when, after a continuing disability review, it was determined that her medical condition had improved.  Accordingly, the Plaintiff was notified that she was no longer disabled as of August 2002, and that her benefits would end in October 2002.  (Tr. 30, 32-35)  The Plaintiff requested reconsideration of the decision to cease her benefits (Tr. 36), and she appeared before a Disability Hearing Officer on August 22, 2003.  (Tr. 37-57)  On September 19, 2003, the Disability Hearing Officer found that Plaintiff's disability had ceased in August 2002.  (Tr. 31, 37-59)

---

[2]    The Commissioner's regulations define an individual under the age of 50 as a "younger person."  If someone is a "younger person," the Commissioner generally does not consider that his or her age will seriously affect his or ability to adjust to other work.  See 20 C.F.R. § 416.963(c).

Next, the Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. 60)  On May 11, 2004, Administrative Law Judge William F. Pope (the "ALJ") conducted a hearing into the matter in Florence, South Carolina.  The Paltiniff and her attorney, Christi McDaniel, were present, as well as William Stewart, a vocational expert (the "VE").  (Tr. 487- 525)  In a decision dated September 24, 2004, the ALJ found in that Plaintiff's disability had ceased in August 2002.  (Tr. 12-24)  Plaintiff requested review of the ALJ's decision (Tr. 8), which the Appeals Council denied on March 31, 2006.  (Tr. 5-7)  Thus, the ALJ's decision became the Commissioner's final decision for purposes of judicial review.  *See* 42 U.S.C. § 1383(c)(3); 20 C.F.R. § 416.1481 (2006).

### B.  Medical Evidence of Record

The medical evidence relevant to Plaintiff's condition since October 22, 1997, the comparison point date for purposes of evaluating whether her disability continued, showed that she was obese and had knee joint problems.  An x-ray on April 22, 1997, showed that Plaintiff had moderate medial arthritis in both of her knees.  (Tr. 316)  Treatment notes from Steven Smith, M.D., her primary care physician, dated between May and August 1997, showed that Plaintiff weighed over 300 pounds.  (Tr. 291-92).

In September 1997, Dr. Smith noted that Plaintiff had pain and 15% decreased range of motion in her knees.  (Tr. 290) Between January 1998 and February 2000, Dr. Smith prescribed medications for osteoarthritis, obesity, hypertension, and respiratory complaints.  (Tr. 424-40) On March 22, 2000, Dr. Smith stated that Plaintiff's weight was a major contributing factor to her osteoarthritis and recommended gastric bypass surgery.  (Tr. 424)

In April 2000, Plaintiff was treated at the Pee Dee Mental Health Center for panic disorder and prescribed Prozac (an anti-depressant) and Xanax (an anti-anxiety medication).  (Tr.

342)  On May 19, 2000, Plaintiff returned to the Pee Dee Mental Health Center and reported to James Mazgaj, M.D., that she experienced panic attacks less often and "fe[lt] better overall".  (Tr. 341)

On September 5, 2000, Plaintiff presented to David Anderson, M.D., for evaluation of her morbid obesity.  Dr. Anderson found that Plaintiff was 5'8" and weighed 316 pounds and noted her history of severe knee arthritis, hypertension, asthma, and insomnia.  He concurred with Dr. Smith and recommended gastric bypass surgery.

On September 11, 2000, the Plaintiff underwent gastric bypass surgery, which she tolerated well.  (Tr. 157-80)

In March 2001, six-months after her surgery, Plaintiff returned to Dr. Smith for follow-up to her complaints of osteoarthritis and asthma.  Dr. Smith found that Plaintiff had no abnormalities of her neck, heart, lungs, or abdomen and noted that she weighed 250 pounds.  (Tr. 288)  An x-ray report showed that Plaintiff had moderate medial left knee osteoarthritis and mild medial right knee osteoarthritis.  (Tr. 315)  Later that month, Plaintiff reported occasional panic attacks.  (Tr. 336)

In April through May 2001, Dr. Smith saw Plaintiff for asthma and moderate bilateral knee osteoarthritis.  He prescribed medications and administered B-12 injections for anemia.  (Tr. 286-87)  In June 2001, an MRI study of Plaintiff's left knee was negative.  (Tr. 224, 313-14)  Treatment notes from Pee Dee Mental Health Center showed that her anxiety was well-controlled.  (Tr. 335)  Plaintiff reported to Dr. Smith that her knee pain and depression were improving, and he continued her medications.  (Tr. 285)  In August 2001, Plaintiff underwent an aortic ultrasound, which was negative.  (Tr. 210, 223, 312) In September 2001, Dr. Smith treated her with medications for thigh muscle cramping and gastric reflux.  (Tr. 281)  Plaintiff was seen

at the Pee Dee Mental Health Center, and S.P. Alvin, M.D., found that her sleep and mood were better, and that her appetite and energy were "okay".  (Tr. 334)

On October 4, 2001, a lumbar spine MRI showed that Plaintiff had a small right disc herniation at the L3-4 disc level.  It showed changes at the L3-4 and L4-5 disc levels, indicating that Plaintiff previously underwent left laminectomy surgery.4  It also showed abnormal epidural soft tissue surrounding Plaintiff's left L5 nerve root.  (Tr. 209, 222, 309-11) Between November and December 2001, Dr. Smith treated Plaintiff for complaints of pain by prescribing narcotics and muscle relaxers.  (Tr. 277-78)  Plaintiff also saw Dr. Alvin at Pee Dee Mental Health and reported improved sleep and "okay" appetite and energy.  (Tr. 333)

In January 2002, Plaintiff presented to Linda Schuck, D.O., with complaints of chest pain, dizziness (sweating), and leg pain and cramping.  She reported that she smoked a half-pack of cigarettes per day.  Dr. Shuck found that Plaintiff weighed 192 pounds, which represented a weight loss of about 148 pounds since her gastric bypass surgery.  She also found that Plaintiff's blood pressure was 142/80.  (Tr. 229-30)  An echocardiogram showed that Plaintiff's left atrium was enlarged, but was otherwise normal.  (Tr. 243-45)  Later that month, a nuclear cardiac stress test was abnormal, suggesting an anterior heart wall defect.  (Tr. 208, 219, 242)  A Holter monitor report indicated that Plaintiff had appropriate heart rates.  (Tr. 231, 233-40). Plaintiff's chest x-ray was normal (Tr. 220, 246), and a heart catheterization study showed that she had normal coronary artery anatomy and left ventricular functioning.  (Tr. 206, 218, 241).  An x-ray of Plaintiff's cervical spine was normal.  (Tr. 207, 221)

Plaintiff went to the emergency room with complaints of left neck pain on February 3, 2002, where she demonstrated normal strength, sensation, pulses, and ranges of motion in her upper and lower extremities; unlabored respiratory effort; and clear lungs.  (Tr. 204)  The

following month, Plaintiff reported to Dr. Alvin that her sleep, energy, and mood were better, and that her appetite was okay. (Tr. 332) Dr. Shuck examined Plaintiff on February 7, 2002, and found normal heart sounds, clear lungs, and blood pressure of 166/94, for which she prescribed

Uniretic (anti-hypertensive medication). In March 2002, Dr. Shuck found that Plaintiff had no edema and normal heart and lungs. Dr. Shuck told Plaintiff to stop smoking. (Tr. 322) In April 2002, the Plaintiff reported to Dr. Alvin that her energy was better, her sleep and appetite were good, and her mood was average. (Tr. 332)

In a Daily Activities Questionnaire dated May 1, 2002, Plaintiff stated that her daughter helped her wash her hair because her arms hurt when she raised them above her head. She stated that she could not stand for very long. She said she spent her time watching television, talking to friends on the phone, and going to church when she felt up to it (Tr. 136-39).

On May 6, 2002, Plaintiff saw Dr. Smith for complaints of "stress issues" and pain. He found that she weighed 178 pounds and had "done a great job with her weight." He prescribed Lortab, Zanaflex, and Paxil. (Tr. 272) On May 17, 2002 Dr. Smith stated in response to an information request from the State disability determination agency that Plaintiff's range of motion in both knees and in her lower back was "significant[ly] impaired". (Tr. 271) Also in May, Plaintiff reported to Dr. Alvin that her sleep and appetite were "alright" and that her energy and mood were "better". (Tr. 331)

On May 29, 2002, James Weston, M.D., a State agency physician, reviewed the medical evidence and concluded that Plaintiff could perform light work[3] that did not require more than occasional climbing, balancing, stooping, kneeling, crouching, and crawling.  (Tr. 407-14)

On June 11, 2002, Lisa Klohn, Ph.D., a State agency psychological consultant, evaluated the medical evidence and concluded that Plaintiff had an anxiety disorder, resulting in moderate limitations of her activities of daily living, social functioning, and concentration, persistence, and pace, and no episodes of decompensation.  (Tr. 389-402)

On July 11, 2002, a lumbar spine x-ray showed that Plaintiff had degenerative changes in her lower lumbar spine.  (Tr. 308)  On July 17, 2002, Plaintiff presented to Dominic DeMichele, M.D., for a neurological evaluation.  Dr. DeMichele found that Plaintiff had lost her left ankle jerk and had decreased upper and lower extremity strength secondary to pain.  He found that she had normal sensation and coordination.  He diagnosed Plaintiff with osteoarthritis and discogenic disease.  He recommended that she undergo several imaging studies and prescribed her medications.  (Tr. 350-51)

In a report of contact dated July 18, 2002, Plaintiff's counselor at Pee Dee Mental Health Center stated that her panic attacks were occasional, her ability to deal with people and go places was improved, and her anxiety responded well to medication.  (Tr. 140)

---

[3]   "Light" work is defined in 20 C.F.R. § 404.1567(b) as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

Treatment notes from Dr. Alvin dated July 26, 2002, showed that Plaintiff's sleep, appetite, and energy were good. Dr. Alvin's notes also reflected that Plaintiff was "doing well" on her medication regimen. (Tr. 331)

On August 13, 2002, a cervical spine MRI study was normal. (Tr. 352) A lumbar spine MRI study was also normal. (Tr. 353) A whole-body bone scan was abnormal, indicating osteoarthritic changes. A bone density scan of Plaintiff's lumbar vertebrae and femurs were normal. (Tr. 354-55) On August 15, 2002, Dr. DeMichele diagnosed mechanical back and neck pain and prescribed narcotic and anti-inflammatory medications. (Tr. 349) On August 20, 2002, Dr. Klohn reviewed the medical evidence and concluded that Plaintiff's anxiety disorder resulted in moderate limitations on her abilities to understand, remember, and carry out detailed instructions; maintain attention; perform activities within a schedule; complete a normal workday and workweek; and interact appropriately with the public. Dr. Klohn concluded that Plaintiff could perform simple tasks with ordinary supervision, but might not be suited for working with the general public. (Tr. 385-88)

In September 2002, Plaintiff returned to Dr. Smith, who found that her blood pressure had decreased to 116/64 and recommended a left knee x-ray secondary to her complaints of joint pain. (Tr. 267) That x-ray showed that she had "minimal" osteoarthritis in her left knee. (Tr. 307) Plaintiff saw Dr. Alvin later that month and reported that she was a full-time nursing student at Florence Technical College. She also reported that her sleep, mood, appetite, and energy were all good, and that she had not had any panic attacks since her previous visit. (Tr. 330) The following month, Dr. Smith treated Plaintiff for an upper respiratory infection and pneumonia. (Tr. 265-66, 305-06)

In December 2002, Plaintiff saw Dr. Smith again, who noted that she weighed 172 pounds and had well-controlled blood pressure of 120/80. (Tr. 264) A cervical spine MRI study showed that Plaintiff had mild diffuse degenerative disc disease and osteoarthritis. (Tr. 327) Plaintiff also saw Dr. Alvin and told him that she made "B's" in her classes. She also reported good sleep, mood, appetite, and energy. (Tr. 330)

In January 2003, Plaintiff presented to William Stamper, M.D. for treatment. She reported she was doing "reasonably well" with her depression. She said she had not received a B-12 shot for a while, although she was supposed to get one every month. Dr. Stamper diagnosed her with depression, gastric bypass, and neck and lumbar spine osteoarthritis. He prescribed anti-inflammatory medications and continued the B-12 injections. (Tr. 321) Later that same month, Plaintiff also saw Dr. DeMichele and reported she was "holding her own" and "doing well" on her medication regimen. (Tr. 346)

In February 2003, the Plaintiff reported to Dr. Alvin that she was "doing good" in school, and that her sleep, mood, appetite, and energy were all good. She also reported that she had not experienced any panic attacks. Dr. Alvin prescribed Adderall (a medication for ADHD) and continued her other medications. (Tr. 329) Dr. Stamper treated Plaintiff for an upper respiratory infection with medications. (Tr. 320) A chest x-ray indicated chronic right base pleural thickening, but no evidence of acute disease. (Tr. 304)

In March 2003, Plaintiff saw Dr. Stamper, who found that Plaintiff demonstrated expiratory wheezing and a few rhonchi. Dr. Stamper adjusted Plaintiff's medications and instructed her to stop smoking. (Tr. 319) A chest x-ray performed later this month showed that Plaintiff had pleural thickening or scarring in her right lung. (Tr. 326)

Eloise Bradham, M.D., another State agency physician, reviewed the medical evidence and found that Plaintiff could perform light work. (Tr. 374-81). W. Pearce McCall, Ph.D., another State agency psychologist, evaluated the medical evidence since October 22, 1997, and found that Plaintiff had an anxiety disorder, resulting in moderate limitations on her activities of daily living, social functioning, and concentration, persistence, and pace. He found that Plaintiff had not experienced episodes of decompensation. (Tr. 356-69) He also found that Plaintiff had moderate limitations on her abilities to complete a normal workday and workweek, interact with the general public, respond to changes in the work setting, travel to unfamiliar places, and set realistic goals. He concluded that she could do simple and some complex tasks in a low-stress, supervised environment with limited public interaction. (Tr. 382-84)

From April through June 2003, Plaintiff continued to report that she was doing well in nursing school, and that medications helped her symptoms. (Tr. 329) Dr. Stamper also treated Plaintiff for respiratory symptoms. Plaintiff reported that she continued to smoke cigarettes, and Dr. Stamper adjusted her medications and recommended smoking cessation. (Tr. 317-18) In July 2003, Plaintiff saw Dr. DeMichele, who found that she was "doing well". (Tr. 345) In September 2003, Pee Dee Mental Health Center notes indicated that Plaintiff was doing well. (Tr. 450)

In October 2003, Plaintiff reported to Dr. Stamper that she was still smoking cigarettes. (Tr. 443) The following month, Dr. Stamper noted that Plaintiff was "doing well." He also noted that her weight was stable, and that her anxiety was "holding well" with Prozac at bedtime. Plaintiff reported that she still smoked. Dr. Stamper found that Plaintiff had negative straight leg raise tests and normal reflexes. He also adjusted her medications. (Tr. 480) In December 2003,

Plaintiff again reported that she was doing well, and Dr. Stamper found that she had negative straight leg raise tests and normal reflexes.  (Tr. 478-79)

In March 2004, Dr. Stamper saw Plaintiff and diagnosed her with low radicular pain and lumbago (dull, aching lumbar pain).  (Tr. 470-71) . A lumbar MRI study showed that Plaintiff had degenerative disc disease and osteoarthritis, post-surgical changes at the L5 disc level on the left, spondylosis at the L4-5 disc level, no recurrent herniation or spinal stenosis, and enhancing scar tissue.  (Tr. 484)  The following month, Dr. Stamper again found that Plaintiff had negative straight leg raise testing and normal reflexes.  (Tr. 468-69)

On May 12, 2004, Dr. Stamper stated that Plaintiff's weight loss had not cured her osteoarthritis.  He opined that she was unable to sit or stand for more than 30 minutes at a time, or walk more than ten minutes at a time.  He stated that she had disabling multiple joint arthritis with osteoarthritis.  He found that after her gastric bypass surgery, she experienced significant weight loss, dumping syndrome (syndrome marked by symptoms of sweating and weakness after eating in patients who have undergone gastric bypass), and diarrhea after eating.  He also found that she had depression.  (Tr. 485-86)

B.  Testimony at the Hearing

At the hearing before ALJ Pope on May 11, 2004, the Plaintiff testified that she weighed 194 pounds, but that she weighed 164 pounds six months earlier.  She also testified that she attended Florence Technical School in 2002 for about one year.  She began studying to become a nurse, but later changed her mind and took courses to become a surgical technologist.  (Tr. 491, 493)  She said she watched TV during the day.  (Tr. 496)  She has a valid driver's license and usually drives no further than 8-10 miles.  (Tr. 494, 498)  The Plaintiff said that Dr. Stamper, her primary care physician, treats her for osteoarthritis, degenerative disc disease in her lower back,

which causes pain running from her legs down to her feet, anxiety, panic attacks, depression and stomach disorders. (Tr. 500, 503) She testified she had dumping syndrome, but admitted that no one had actually diagnosed her with dumping syndrome. (Tr. 501-502) She also stated that she had pain in her knees, elbows, shoulders, and neck. She took Percocet, four times a day, and Tylenol, and Tylenol PM and Zanaflex at night. (Tr. 507) She had no side effects from her medications. (Tr. 507) She said she could sit for 30-45 minutes at a time, and walk and stand for 10-15 minutes each. She said she could not bend or do housework and had difficulty reaching overhead or lifting more than five pounds. (Tr. 509) She said that she no longer went to the mental health center. (Tr. 510) Plaintiff took Valium for anxiety and Prozac for depression.[4] She also said that she had to lay down three or four times a day; read for 20-30 minutes at a time, made her bed, picked dishes up off the table and could microwave meals and make hotdogs. She cannot mop, vacuum, or do other housework because she would be in pain. She has a panic attack at least once a week. (Tr. 489-518)

The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, with her education and past work experience, who was limited to performing work with restrictions that require simple routine work, a low stress supervised environment, limited interaction with the public or team type interaction with co-workers, no lifting or carrying over 20 pounds occasionally and 10 pounds frequently, no standing and/or walking over six hours in an eight-hour day; only occasional stooping, twisting, crouching, kneeling and climbing of stairs or ramps; no crawling, balancing or climbing of ladders or scaffolds; no foot pedals or other controls with the left lower extremity; and avoidance of hazards such as unprotected heights,

---

[4]    At the hearing on May 11, 2004, the ALJ went through each of the medications listed by the Plaintiff on a List of Medications dated May 4, 2004. (Tr. 154) Plaintiff testified that she was no longer taking Xanax, Ritalin, Adderal, or Wellbutrin. (Tr. 511-515)

vibration, and dangerous machinery.  (Tr. 520-21)  With these limitations, the VE testified that

such an individual could perform the jobs of hand packer, hand sorter, trimmer, hand cleaner,

weight tester, inspector, and assembler.  (Tr. 521)

### The Administrative Decision

In making the determination that the Plaintiff is not entitled to benefits, the

Commissioner has adopted the following findings of the ALJ:

1.    The claimant was found to be disabled within the meaning of the Social Security Act and regulations, beginning June 1, 1997, and has not engaged in substantial gainful activity since that date.

2.    The medical evidence established that the claimant's diagnosed arthritis, left leg radiculopathy, anemia, obesity, and anxiety are "severe" impairments, but not severe enough to meet or equal the criteria set forth in the Listing of Impairments.

3.    The impairment present as of October 22, 1997, the time of the most recent favorable medical determination that the claimant was disabled, was arthritis and obesity which met section 9.09A of the Listing of Impairments.

4.    The medical evidence establishes that there has been significant medical improvement in the claimant's medical condition since October 22, 1997.

5.    This medical improvement is related to the claimant's ability to work.

6.    The claimant's subjective allegations regarding her functional limitations are not fully credible and not supported by medical evidence.

7.    As of August 2002, the claimant had the residual functional capacity to perform work with restrictions that require simple, routine work; a low stress, supervised environment; limited interaction with the public or "team" - type interaction with co-workers; no lifting or carrying over 20 pounds occasionally and 10 pounds frequently; no standing and/or walking over 6 hours in an 8-hour workday; occasional stooping, twisting, crouching, kneeling, and climbing of stairs or ramps; no crawling, balancing, or climbing of ladders or scaffolds; no foot pedals or other controls with the left lower extremity; and avoidance of hazards such as unprotected heights, vibration, and dangerous machinery.

8.    The claimant is unable to return to her past relevant work as a convenience store cashier/clerk.  (20 CFR § 416.965)

9.    The claimant is 47 years of age, which is defined as a "younger individual" (20 C.F.R. § 416.963).

10.   The claimant has more than a "high school" education.  (20 C.F.R. § 416.964).

11.   The claimant's acquired skills from past relevant work are not transferable to other work because of the residual functional capacity restriction of simple, routine work. (20 C.F.R. § 416.968).

12.   The claimant has the residual functional capacity to perform a significant range of light work (20 C.F.R. § 416.967).

13.    Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.21 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples include the light, unskilled jobs of bench hand worker, inspector/examiner, and assembler, with over 280,000 such jobs in the national economy.

12.    The claimant has not been under a "disability," as defined in the Social Security Act, at any time since August 2002, with eligibility for benefits terminating on the closed of the last day of October 2002. (Tr. 22-24)

## VI. SCOPE OF REVIEW

Under the Social Security Act, 42 U.S.C. § 405(g) and § 1383(c)(3), this Court's scope of review of the Commissioner's final decision is limited to: (1) whether the decision of the Commissioner is supported by substantial evidence, and (2) whether the conclusions are legally correct under controlling law. *Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

The Court's scope of review is specific and narrow. It does not conduct a *de novo* review of the evidence, and the Commissioner's finding of non-disability is to be upheld, even if the Court disagrees, so long as it is supported by substantial evidence. 42 U.S.C. § 405(g); *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). "Substantial evidence" is that evidence which a "reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Such evidence is generally equated with the amount of evidence necessary to avoid a directed verdict, and "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Shivey v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). "In reviewing for substantial evidence, [the Court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). It is the duty of the ALJ reviewing the case, and not the responsibility of this Court, to make findings of fact and resolve conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). If substantial

evidence supports the Commissioner's decision that a claimant is not disabled, the decision must be affirmed. *Blalock*, 483 F.2d at 775.

## VI. APPLICABLE LAW AND REGULATIONS

The Social Security Act requires that an individual's entitlement to SSI be reviewed periodically. *See* 42 U.S.C. § 1382c(a)(4). In evaluating whether disability continues under Title XVI of the Act, the Commissioner applies a seven-step sequential analysis. *See* 20 C.F.R. § 416.994(b)(5)(I)-(vii), not the five-step sequential evaluation used for initial SSI claims. *See* 20 C.F.R. § 416.920.

In employing the seven-step analysis, the Commissioner first determines whether the claimant's medically determinable impairment(s) meet or equal one or more of the impairments listed at 20 C.F.R. pt. 404, subpt. P., app. 1. *See* 20 C.F.R. § 416.994(b)(5)(I). If a claimant's impairments meet or equal a listing, disability continues.

If the claimant's impairments do not meet or equal a listing, the Commissioner then determines whether the claimant's impairments have medically improved, as shown by a decrease in medical severity. *See id.* § 416.994(b)(5)(ii). For SSI purposes, "medical improvement" is any decrease in the medical severity of any impairment which was present at the time of the most recent favorable decision that a claimant was disabled or continued to be disabled. 20 C.F.R. § 416.994(b)(1)(i). If the claimant's impairments have not medically improved, disability continues.

If there has been medical improvement, the Commissioner next determines whether that improvement relates to the claimant's ability to work. *See id*. § 416.994(b)(5)(iii). That is, the Commissioner must determine whether, due to medical improvement, the claimant's residual functional capacity to perform basic work activities has increased based on impairments that

were present at the time of the most recent favorable medical determination (the comparison point).  *See id.* § 416.994(b)(1)(i)-(iv), 5(iii).  If medical improvement leads to an increase in the functional capacity to perform basic work activities, the analysis goes forward.

If it does not, the Commissioner considers whether an exception applies, which comprises the next step.  *See id.* § 416.994(b)(3)-(4), 5(iv).  If an exception applies, disability ceases.  If not, the analysis goes forward.

Next, the Commissioner must determine whether the claimant's impairments, alone or in combination, are severe[5] or limit the performance of basic work activities.  *See id.* § 416.994(b)(5)(v).  If the impairments alone or in combination are not severe, then disability ceases.  If the impairments alone or in combination are severe, then the case moves forward.

Next, the Commissioner determines whether the claimant can perform her past relevant work.  *See id.* § 416.994(b)(5)(vi).  If the claimant can perform her past relevant work, disability ceases.  If she cannot, then the analysis proceeds to the next step.

Finally, the Commissioner determines whether the claimant can perform other jobs existing in significant numbers in the national economy.  *See id.* § 416.994(b)(5)(vii).  If the claimant cannot perform a significant number of other jobs, she remains disabled, despite medical improvement.  If the claimant can perform a significant number of other jobs, then disability ceases.

## VII.  DISCUSSION OF THE ALJ'S DECISION

Consistent with the seven-step "sequential evaluation" for the adjudication of SSI claims, the ALJ first found that Plaintiff did not have an impairment that met or equaled an impairment

---

[5]     An impairment or combination of impairments is considered "severe" when it "significantly limits an individual's physical or mental abilities to do basic work activities."  20 C.F.R. § 404.1520(c); Social Security Ruling ("SSR") 96-3p.

listed at 20 C.F.R. pt. 404, subpt. P., app. 1, and was thus not presumptively disabled.  (Tr. 13,

23)  Next, the ALJ found that since October 22, 1997, the comparison point decision for this

case, Plaintiff's impairments had medically improved.  (Tr. 18-19, 23)  The ALJ found that

Plaintiff's medical improvement was related to her ability to work.  (Tr. 23)  The ALJ found that

Plaintiff's severe impairments included arthritis, left leg radiculopathy, obesity, anemia, and

anxiety.  (Tr. 13, 23)  The ALJ found that Plaintiff retained the residual functional capacity to

perform

> work with restrictions that require simple, routine work; a low stress, supervised
> environment; limited interaction with the public or "team"-type interaction with co-workers;
> no lifting or carrying over 20 pounds occasionally and 10 pounds frequently; no standing
> and/or walking over 6 hours in an 8-hour workday; occasional stooping, twisting,
> crouching, kneeling, and climbing of stairs or ramps; no crawling, balancing, or climbing of
> ladders or scaffolds; no foot pedals or other controls with the left lower extremity; and
> avoidance of hazards such as unprotected heights, vibration, and dangerous machinery.
> (Tr. 20)

The ALJ found that Plaintiff's residual functional capacity precluded her from performing her

past relevant work.  (Tr. 20, 23)  Then, based on testimony by the VE, the ALJ found that

Plaintiff was not disabled as of August 2002 because there were other jobs in significant

numbers in the national economy she could perform despite her limitations.  (Tr. 22-23)

## VIII.  PLAINTIFF'S OBJECTION

> "The general issue before this Court is whether or not the Commissioner erred in finding that the
> Plaintiff's disability had ceased, that there was medical improvement, and she was no longer
> disabled."[6]

## IX.  DISCUSSION

**The Medical Evidence Supported the ALJ's Finding That Plaintiff's Condition Had
Medically Improved since October 1997, and That Her Medical Improvement Was Related
to the Ability to Work**.

---

[6]     *See* Plaintiff's Brief [11] at p.1.

At the second step of the sequential analysis for evaluating whether disability continues pursuant to Title XVI of the Act, the ALJ found that Plaintiff's medical condition had improved since October 22, 1997, the comparison point date in this case. (Tr. 18-19, 23) Because this finding was supported by substantial evidence, it is conclusive upon the Court.

As explained above, medical improvement is determined by a showing of decrease in medical severity. See 20 C.F.R. § 416.994(b)(5)(ii). There was substantial evidence in the record to support the ALJ's conclusion that Plaintiff's conditions had medically improved. For example, prior to Plaintiff's award of benefits in October 1997, she weighed approximately 310 pounds. (Tr. 291) An x-ray report dated April 22, 1997, showed that she had moderate medial arthritis in both of her knees. (Tr. 316) Her weight continued to increase until she weighed 316 pounds as of September 5, 2000. (Tr. 157-80) However, Plaintiff's September 2000 gastric bypass surgery resulted in dramatic weight loss through August 2002; when she saw Dr. Smith in March 2001, he found that she weighed 250 pounds. (Tr. 288). In January 2002, she weighed 192 pounds, which represented a total weight loss of 148 pounds up to that point. (Tr. 229-30) By May 2002, Dr. Smith found that she weighed 178 pounds and that she had "done a great job with her weight". (Tr. 272) In December 2002, she weighed 172 pounds. (Tr. 264) At the hearing on May 11, 2004, the Plaintiff testified that she weighed 194 pounds, and admitted that six months previously, she weighed 164 pounds. (Tr. 494, 497) This weight loss clearly indicated a decrease in the medical severity of Plaintiff's obesity since the comparison point date in this case. See Social Security Ruling (SSR) 02-1p ("We will consider that obesity has medically improved if an individual maintains a consistent loss of at least 10 percent of body weight for at least 12 months").

Medical evidence also showed medical improvement in Plaintiff's osteoarthritis following her gastric bypass surgery.  In April 1997, prior to her entitlement to benefits, x-rays indicated that she had "moderate" medial arthritis in both of her knees.  (Tr. 316)  In March 2001, which was six months after Plaintiff's gastric bypass surgery, x-rays showed moderate medial osteoarthritis in her left knee, and only mild osteoarthritis in her right knee.  (Tr. 315)  A June 2001 MRI study of Plaintiff's left knee was negative, and she reported that her knee pain was improving.  (Tr. 224, 313-14)  By September 2002, an x-ray showed that Plaintiff had only "minimal" osteoarthritis in her left knee.  (Tr. 307)  An MRI study in December 2002 showed that Plaintiff's cervical spine osteoarthritis was mild. (Tr. 327)  These findings showed a decrease in the medical severity of Plaintiff's osteoarthritis.  In sum, the medical evidence supports the ALJ's finding that Plaintiff's medical condition had improved.

The medical evidence also supported the ALJ's finding that Plaintiff's medical improvement was related to the ability to work.  The regulations provide that medical improvement is related to the ability to work if a claimant's residual functional capacity to perform basic work activities has increased based on impairments that were present at the comparison point date.  *See* 20 C.F.R. § 416.994(b)(1)(i)-(iv), 5(iii).  Plaintiff's medical improvement related to her ability to work is evidenced by an emergency room report from February 2002, which showed she had normal strength, sensation, pulses, and ranges of motion in her upper and lower extremities  (Tr. 204)

The Agency had determined Plaintiff was disabled, i.e., unable to perform any substantial gainful activity as of October 1997.  However, after the Plaintiff had her gastric bypass surgery, Dr. Weston, a State agency physician, reviewed the medical evidence and found in May 2002

that Plaintiff's residual functional capacity had increased to the point that she could perform a reduced range of light work. (Tr. 407-414) Almost one year later in March 2003, Dr. Bradham, another State agency physician, found that Plaintiff could perform light work without any nonexertional limitations. (Tr. 374-381) This evidence supported the ALJ's finding that Plaintiff's medical improvement was related to her ability to work because her residual functional capacity had increased since the comparison point date.

Plaintiff argues that the ALJ's finding that her medical improvement was related to her ability to work was erroneous. (Pl.'s Br. 24-25) Specifically, Plaintiff argues that the ALJ ignored the May 2002 opinion of her treating physician, Dr. Smith, that her knee and lower back ranges of motion were still "significantly impaired," which indicated that her osteoarthritis had not improved to the point that she could work. (Pl.'s Br. 25) As a threshold matter, however, "significantly impaired" does not necessarily equal the inability to work. Dr. Weston and Dr. Bradham, the State agency physicians who evaluated Plaintiff's continued eligibility for benefits in May 2002 and March 2003, respectively, and who requested a statement from Dr. Smith, presumably reviewed his opinion with all of the other evidence. Dr. Weston found that Plaintiff could perform a reduced range of light work, and Dr. Bradham found that she could perform light work without any nonexertional limitations. (Tr. 374-381, 407-414) State agency physicians are "experts in the evaluation of the medical issues in disability claims under the Social Security Act." SSR 96-6p, 20 C.F.R. § 404.1527(f)(2)(I); *see also Perales*, 402 U.S. at 408 (holding that the use of non-examining medical experts is proper); *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1993) (an ALJ may properly give significant weight to an assessment from a non-treating physician). The ALJ explicitly found that the opinions of Drs. Weston and

Bradham supported his decision.  (Tr. 22)  Any error by the ALJ in not specifically mentioning

Dr. Smith's opinion with respect to this matter was, at most, harmless, given the wealth of

evidence which supported the ALJ's decision.  *See, e.g., Mickles v. Shalala*, 29 F.3d 918, 921

(4th Cir. 1994) (affirming denial of benefits where the ALJ erred in evaluating a claimant's pain

because "he would have reached the same result notwithstanding his initial error").

Furthermore, to the extent Dr. Smith's opinion can be interpreted as being inconsistent

with the ability to work, Dr. Smith's opinion was not supported by his own treatment notes, or

with other evidence in the record.  It is well settled that if a treating physician's opinion is not

supported by clinical evidence or if it inconsistent with other substantial evidence of record, it

should be accorded significantly less weight.  *See Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir.

2001).

In this case, Dr. Smith's treatment notes do not indicate limitations in Plaintiff's knee or

back ranges of motion following her gastric bypass surgery.  (Tr. 264-316, 424-438)  Moreover,

Dr. Smith's treatment note in June 2001 indicated that Plaintiff's knee pain was improving.  (Tr.

285)  Dr. Smith's opinion was also inconsistent with other evidence in the record, including

several imaging studies and treatment records discussed above (Tr. 288–March 2001 x-ray

showed that Plaintiff's medial right knee osteoarthritis was "mild"; 204–Emergency room report

in February 2002 showed normal strength, sensation, and ranges of motion in all extremities;

224, 313-14–June 2001 left knee MRI study was negative; 307–September 2002 left knee x-ray

showed "minimal" osteoarthritis; 309-11–October 2001 lumbar MRI study showed a "small"

right disc herniation, post-laminectomy changes, and abnormal epidural tissue at L5 nerve root;

468-69, 478-79–From October 2003 to March 2004, Dr. Stamper found that Plaintiff had

negative straight leg raise tests and normal reflexes; 484–March 2004 lumbar MRI study showed no recurrent disc herniation, spinal stenosis, or enhancing scar tissue). Thus, Dr. Smith's opinions were not entitled to controlling weight.

### The Medical Evidence Supported the ALJ's Evaluation of the Severity of Plaintiff's Impairments.

At the fifth step of the sequential analysis for evaluating continuing disability for Title XVI cases, the ALJ found that Plaintiff's severe impairments, pursuant to 20 C.F.R. § 416.994(b)(5)(v), consisted of arthritis, left leg radiculopathy, obesity, anemia, and anxiety. (Tr. 13, 23) An impairment or combination of impairments is "severe" if it "significantly limits [an individual's] physical or mental abilities to do basic work activities." 20 C.F.R. § 416.920(c); *see Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); SSR 96-3p; SSR 85-28. The medical evidence discussed above showed that Plaintiff's arthritis, left leg radiculopathy, obesity, anemia, and anxiety significantly limited her physical and mental abilities to do basic work activities. (Tr. 157-486) Thus, as the ALJ correctly found, these impairments were "severe". (Tr. 13, 23)

Plaintiff argues that the ALJ erred by finding that her dumping syndrome, high blood pressure, herniated discs in her back, and ADHD were non-severe. (Pl.'s Br. 28) The court disagrees. Except for Plaintiff's self-serving testimony (as discussed above), and Dr. Stamper's letter that was submitted after the hearing, there was no evidence whatsoever that she ever had been diagnosed with dumping syndrome. The evidence also showed that, while Plaintiff underwent treatment for hypertension between 1997 and 2002, her blood pressure came under control with medications. (Tr. 157-180, 229-230, 264, 267, 322, 424-440) In August 2002, cervical and lumbar spine MRI studies were normal, and a bone scan showed normal bone

density in Plaintiff's lumbar spine.  (Tr. 353-55)  A December 2002 MRI study showed that

Plaintiff had only "mild" diffuse degenerative cervical disc disease.  (Tr. 327)  In addition, Dr.

Stamper consistently found from October 2003 to April 2004 that Plaintiff's straight leg raise

tests were negative.  (Tr. 468-69, 478-80, 484)  Furthermore, Plaintiff's treatment notes from Pee

Dee Mental Health Center did not indicate a diagnosis for ADHD.  (Tr. 328-43, 450-67)  Indeed,

at the hearing, the Plaintiff admitted that she had never been diagnosed with ADHD (Tr. 512),

and that she was not taking any medication for ADHD.  (Tr. 513-515)  The ALJ correctly found

that these alleged impairments did not rise to the level of "severe" impairments.  (Tr. 13)

### The Medical Evidence Supported the ALJ's Assessment of Plaintiff's Residual Functional Capacity.

Although the ALJ found that Plaintiff had arthritis, leg radiculopathy, obesity, anemia,

and anxiety, the existence of severe impairments alone does not equate with disability.  *See*

*Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) ("A psychological impairment is not

necessarily disabling. There must be a showing of related functional loss.").  The evidence in this

case did not show that Plaintiff's impairments resulted in disabling functional loss or precluded

her from performing the reduced range of light unskilled work as stated in the ALJ's residual

functional capacity assessment.  *See Craig*, 76 F.3d at 590 (lack of objective findings supported

the ALJ's decision).

For example, as discussed above, the evidence indicated that Plaintiff was treated for

osteoarthritis between 1997 and 2004.  However, after her gastric bypass surgery in 2000, and

her  weight loss, various imaging studies showed that her knee osteoarthritis improved (Tr.

288–March 2001 x-ray showed that she her osteoarthritis was moderate in her left knee and mild

in her right knee; 224, 313-14–June 2001 left knee MRI was negative; 307–September 2002 left knee x-ray showed "minimal" osteoarthritis).  A cervical spine MRI study in December 2002 showed only mild disc degeneration and osteoarthritis.  (Tr. 327)  At an emergency room visit in February 2002 for neck pain, Plaintiff had normal strength, sensation, pulses, and ranges of motion in all of her extremities.  (Tr. 204)  As discussed above, Plaintiff lost significant weight after her gastric bypass surgery (Tr. 157-80, 229-30, 264, 272, 288, 291, 316, 494, 497).  Although an October 2001 lumbar spine MRI showed that Plaintiff was status post-laminectomy surgery and had abnormal epidural tissue at the L5 nerve root, she had only a "small" right disc herniation at L3-4.  (Tr. 209, 222, 309-11).  Although Dr. Stamper stated that Plaintiff was disabled in May 2004, his treatment notes between October 2003 and March 2004, showed that she consistently had negative straight leg raises and normal reflexes (Tr. 468-71, 478-79).  *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (opinions of treating and examining physicians are given great weight because they reflect a judgment based on continuing observations over time).

Plaintiff argues that the ALJ improperly evaluated Dr. Stamper's opinion that she could not sit for more than 30 minutes or walk for more than ten minutes at a time and was disabled due to her osteoarthritis.  (Pl.'s Br. 29-30)  As explained previously, the opinion of a treating physician on the nature and severity of a claimant impairment is entitled to controlling weight if it is well-supported by laboratory and diagnostic techniques and is not inconsistent with other substantial evidence in the record.  *See Craig  v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting 20 C.F.R. § 416.927(d)(2)); SSR 96-2p.  Here, Dr. Stamper's opinion was not supported by his own treatment notes, which showed that Plaintiff had negative straight leg raise testing

and normal reflexes.  As the ALJ correctly found, Dr. Stamper's opinion also was not supported by the imaging studies discussed above, which indicated only "mild" or "minimal" findings.  (Tr. 209, 222, 224, 288, 307, 309-11, 327).  Dr. Stamper's opinion also was inconsistent with the findings of the State agency physicians, who found that Plaintiff could perform a range of light work, e.g., up to 6 hours of standing/walking in an eight-hour workday.  (Tr. 374-81, 407-14)  Thus, the ALJ properly rejected Dr. Stamper's opinion.  (Tr. 17)

As discussed above, Dr. Weston found in May 2002 that Plaintiff could perform light work with no more than occasional climbing, balancing, stooping, kneeling, crouching, and crawling (Tr. 407-14), and Dr. Bradham found in March 2003 that she could perform the full range of light work.  (Tr. 374-81)  The ALJ relied on the findings of these experts, who are trained in the medical requirements for disability under the Act, in concluding that Plaintiff could perform the physical demands of a reduced range of light work with limitations as stated above.  (Tr. 22)  *See* 20 C.F.R. § 416.927(f); SSR 96-6p ("Findings of fact made by State agency [] consultants regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources."); *see also Perales*, 402 U.S. at 408.

With regard to Plaintiff's mental impairments, treatment notes from Pee Dee Mental Health Center and Dr. Alvin consistently showed that her sleep, mood, appetite, and energy were"okay" or improving.  (Tr. 329-34, 450)  *See Coffman*, 829 F.2d at 517 (opinions of treating and examining physicians are given great weight because they reflect a judgment based on continuing observations over time).  Drs. Klohn and McCall, two State agency psychological consultants who evaluated whether Plaintiff continued to be disabled in 2002 and 2003, found that she could perform simple tasks in a low-stress environment with limited public interaction.

(Tr. 382-402)  Their findings supported the ALJ's conclusion that Plaintiff could perform unskilled work in a low-stress, supervised environment with limited public or team type interaction.  (Tr. 20, 22-23)  *See* 20 C.F.R. § 416.927(f); SSR 96-6p ("Findings of fact made by State agency [] consultants regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources."); *see also Perales*, 402 U.S. at 408.  The court finds that there existed in the record ample medical evidence to support the ALJ's conclusion that Plaintiff had the residual functional capacity to perform a significant number of jobs in the national economy.

### Substantial Evidence Supported the ALJ's Conclusion That Plaintiff's Subjective Complaints Regarding Her Limitations Were Not Fully Credible.

The ALJ's credibility determinations are entitled to deference by this court.  *Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984) (holding that the ALJ's credibility determinations are entitled to great weight because the ALJ had the opportunity to observe the demeanor and assess the credibility of the claimant).  The ALJ was not required to accept without question the Plaintiff's complaints.  *See Craig*, 76 F.3d at 591.  Instead, when determining the credibility of Plaintiff's subjective complaints, the ALJ properly considered all of the evidence, medical and non-medical.  *Id*. at 595; *see also Mickles*, 29 F.3d at 921; *Gross*, 785 F.2d at 1166; SSR 96-7p (adjudicator must make a finding of credibility based on consideration of the entire case record, including medical and nonmedical evidence).  Because the ALJ's credibility determination is supported by substantial evidence, the court will defer to it and not substitute its judgment for that of the ALJ, the finder of fact.  *See Hays*, 907 F.2d at 1456.

In the present case, the ALJ acknowledged Plaintiff's subjective complaints, including her statements that she had dumping syndrome, panic attacks, shortness of breath, and pain in her back, legs, feet, elbows, shoulders, and neck.  He also considered her allegations that she could only sit for 30-40 minutes, walk and stand for 10-15 minutes each, and never bend, do housework, reach overhead, or lift more than five pounds.  (Tr. 18)  The ALJ, however, is not required to accept Plaintiff's allegations without question.  *See Craig*, 76 F.3d at 591.  The ALJ considered the evidence as a whole and properly found that Plaintiff's subjective complaints were not credible.  (Tr. 19, 23)  *See* 20 C.F.R. § 416.929(c); SSR 96-7p (adjudicator must make a finding of credibility based upon consideration of the entire case record, including medical and nonmedical evidence).

The ALJ found that Plaintiff's subjective testimony regarding the severity of her symptoms was not consistent with the objective medical evidence.  (Tr. 15)  The objective medical findings of Drs. Smith and Stamper, imaging studies in the record, and conclusions of the State agency physicians, did not indicate the degree of symptomology and physical limitation that Plaintiff alleged (Tr. 204–Plaintiff had normal strength, sensation, pulses, and ranges of motion in all of her extremities; 264–Plaintiff lost significant weight after her surgery; 209–Lumbar spine MRI showed only "small" right L3-4 disc herniation; 288–x-ray showed that arthritis was "moderate" in Plaintiff's left knee and "mild" in her right knee; 307–left knee x-ray showed "minimal" osteoarthritis; 313-14–left knee MRI was negative; 327–cervical spine MRI showed only mild disc degeneration and osteoarthritis; 407-14–Plaintiff could perform light work; 468-71, 478-79–Plaintiff had negative straight leg raises and normal reflexes).  The objective medical findings of Dr. Alvin and the State agency psychological consultants did not

indicate disabling mental limitations (Tr. 329-34–Plaintiff's sleep, mood, appetite, and energy were "okay" or improving; 382-402–Plaintiff could perform unskilled work in a low-stress, limited public contact setting). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005) (the ALJ can reject claimant's testimony because it was inconsistent with the objective medical evidence); 20 C.F.R. § 416.929(c); SSR 96-7p.

Plaintiff also was not compliant with treatment. For example, the Plaintiff was instructed on numerous occasions to stop smoking, but she did not do so. (Tr. 209-30, 317-19, 322, 478-80). This failure to follow a recommended course of treatment reduced Plaintiff's credibility. (Tr. 14-16). *Cf. English v. Shalala*, 10 F.3d 1080, 1084 (4th Cir. 1993) (failure to take prescribed medication cited with approval as a factor in crediting a claimant's testimony). The evidence also showed that Plaintiff's anxiety was well-controlled with medication, and the number of anxiety attacks she experienced decreased over time. (Tr. 329-334, 450) As the ALJ found, this evidence undermined Plaintiff's complaints of disabling panic attacks. (Tr. 16, 18) *See Gross*, 785 F.2d at 1166 (if a symptom can be reasonably controlled with medication or other treatment, it is not disabling).

Significantly, the evidence showed that Plaintiff returned to school for two semesters in 2002 (Tr. 304, 329-30, 491-92). The ALJ found that the Plaintiff's school attendance undermined her complaints that her symptoms were so severe as to be disabling. (Tr. 17-18) *See House v. Shalala,* 34 F.3d 691, 694 (8th Cir. 1994) (fact that the claimant could successfully attend college and obtain a B.A. degree supported the ALJ's conclusion that claimant's headaches and neurological deficits were not totally disabling). Evidence of Plaintiff's other activities also undermined her complaints of disabling symptoms. Plaintiff stated in a daily

activities questionnaire and in her testimony that she drove, read for 20-30 minutes at a time, made beds, picked dishes up off her table, talked to friends on the telephone, and went to church when she felt like it.  (Tr. 489-518)  These activities, while not determinative, were properly considered by the ALJ in assessing the credibility of Plaintiff's subjective complaints.  (Tr. 18) *See Johnson*, 434 F.3d at 658 (accepting ALJ's finding that claimant's daily activities were inconsistent with complaints of incapacitating pain where claimant attended church, read, watched television, cleaned house, washed clothes, visited relatives, fed pets, cooked, managed finances, and performed stretching exercises); *Mickles*, 29 F.3d at 921 ("The only fair manner to weigh a subjective complaint of pain is to examine how the pain affects the routine of life"); *Gross*, 785 F.2d at 1166 (affirming finding of no disability where claimant managed his household, grocery shopped, cooked, washed dishes, and walked to town each day).

For all of these reasons, the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible was supported by substantial evidence, and will be upheld by the court.  *See Hays*, 907 F.2d at 1156.

### Substantial Evidence Supported the ALJ's Conclusion That Plaintiff Could Perform a Significant Number of Jobs in the National Economy.

The ALJ found that Plaintiff could not return to her past relevant work as a convenience store cashier/clerk.  (Tr. 20)  Therefore, the issue became whether other work that Plaintiff could perform existed in significant numbers in the national or regional economies.  *See McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981); 20 C.F.R. § 416.994(b)(5)(vii).

In this case, the ALJ asked Mr. Stewart, the VE, to assume a hypothetical individual of

Plaintiff's age, with her education and past work experience, who was limited to:

> work with restrictions that require simple, routine work; a low stress, supervised
> environment; limited interaction with the public or "team"-type interaction with co-workers;
> no lifting or carrying over 20 pounds occasionally and 10 pounds frequently; no standing
> and/or walking over 6 hours in an 8-hour workday; occasional stooping, twisting,
> crouching, kneeling, and climbing of stairs or ramps; no crawling, balancing, or climbing of
> ladders or scaffolds; no foot pedals or other controls with the left lower extremity; and
> avoidance of hazards such as unprotected heights, vibration, and dangerous machinery.

(Tr. 20)  With these limitations, Mr. Stewart testified that such an individual could

perform the jobs of hand packer, hand sorter, trimmer, hand cleaner, and weight tester (4,000

jobs in South Carolina, 120,000 nationally).  (Tr. 521)  The VE also testified that such an

individual could perform the job of inspector or examiner (4,000 jobs in South Carolina, 720,000

nationally), and assembler (2,000 jobs in South Carolina, 40,000 nationally).  (Tr. 521)  The ALJ

accepted this testimony and found these jobs to exist in significant numbers.  (Tr. 21-24)  See

Sultan, 368 F.3d at 864 ("The Commissioner may rely on a vocational expert's response to a

properly formulated hypothetical question to meet her burden of showing that jobs exist in

significant numbers which a person with the claimant's residual functional capacity can

perform" (citations omitted)).  Because Plaintiff could perform a significant number of jobs in the

national economy as of August 2002, she was no longer disabled.  See 20 C.F.R. §

416.994(b)(5)(vii).

Plaintiff argues that the ALJ's hypothetical question to the vocational expert was

defective because it did not include "all of [her] impairments which were reasonably supported

by the record".  (Pl.'s Br. 31)  However, a proper hypothetical question must only reflect all of

the limitations underlined accepted by the ALJ, not all the limitations alleged by a claimant.  *See e.g.,*

*Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989).  The ALJ was not required to include limitations in his hypothetical questions to the vocational expert that he found were not credible or unsupported by the record.  *See Lee v. Sullivan*, 945 F.2d 687, 692 (4th Cir. 1991) (noting that a requirement introduced by claimant's attorney in a question to the vocational expert was not sustained by the evidence, and the testimony in response was without support in the record); The court finds that the Plaintiff's argument is without merit.

As mentioned above, the role of the federal judiciary in the administrative scheme established by the Social Security Act is a limited one.  The Act provides, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]"  42 U.S.C. § 405(g).  In the case now before the court, the Commissioner's final decision is supported by substantial evidence, and the correct law was applied.  Therefore, it is recommended that the decision be affirmed.

## **RECOMMENDATION**

Based on the foregoing, it is recommended that the **Commissioner's decision be affirmed.**

GEORGE C. KOSKO
UNITED STATES MAGISTRATE JUDGE

June 1, 2007

Charleston, South Carolina